In the Matter of the Judicial Settlement of the Accounts of the MARINE TRUST COMPANY OF BUFFALO and Others, as Executors, etc., of EDMUND HAYES, Deceased.

MOREY C. BARTHOLOMEW, as Administrator, etc., of MARY H. HAYES, Deceased, Appellant; DARTMOUTH COLLEGE and Others, Respondents.*

Fourth Department, December 18, 1928.

* Modifying 131 Misc. 806.

*Penney, Persons, Blair & Nye* [*Charles F. Blair* and *Alton R. Erickson* of counsel], for the appellant.

*Kenefick, Cooke, Mitchell & Bass* [*Allen Keeney* of counsel], for executors of the estate of Edmund Hayes, deceased, respondents.

*Moot, Sprague, Brownell & Marcy* [*William L. Marcy* and *Helen Z. M. Rodgers* of counsel], for the respondent Dartmouth College.

*Slee, O'Brian & Hellings* [*John Lord O'Brian* of counsel], for the respondent University of Buffalo.

TAYLOR, J. For many years prior to February 15, 1895, Edmund Hayes was the insured under five life insurance policies of the Equitable Life Insurance Company. He had taken them all out himself. Four of them were payable to " self," and one to Edmund Hayes, " his executors, administrators or assigns." At the expiration of the tontine dividend period of three of these policies, the insured exercised an option available under them, appropriating to his own use the accumulated surplus and continuing the policies on the " ordinary plan." The other two policies were exchanged for paid-up policies, under options contained in them. These policies were all assigned to Mary H. Hayes, wife of Edmund, before

February 9, 1895. On that date Mary and Edmund Hayes made the following " request " or " application " to the insurance company:

" GENTLEMEN:

" Inclosed please find policies Nos. 321827–8 & 9, 322442, and paid-up policy No. 132165, making five in all, on the life of Edmund Hayes. These policies are now drawn to said Edmund Hayes, and assigned by him to his wife, Mary H. Hayes. Please alter these policies or issue new ones in place of these for the benefit of Mary H. Hayes, should she survive her husband, and to the benefit of Edmund Hayes, his executors, administrators or assigns, should he survive his wife. The object being to alter the policies as they now stand so that in case the husband should survive the wife that the policies will then revert to him.

" Yours truly,

" EDMUND HAYES,

" MARY H. HAYES.

" In presence of,

    " GEO. J. SICARD,

    " WM. BURNET WRIGHT, JR.

" P. S. We have no children.

" EDMUND HAYES."

Mrs. Hayes joined in this request with her husband, not as a wife applying for insurance on her husband's life under the statute (Dom. Rel. Law, § 52), but as an assignee of the policies; thus diminishing her interest and making her a beneficiary contingent upon her surviving her husband, instead of an owner by assignment. This was in February, 1895, more than twelve years before any loans were negotiated. Thus, long before loans were contemplated, the wife voluntarily yielded some of her legal rights as assignee, to protect her husband's interest in policies which he had taken out.

February 15, 1895, all the five existing policies were surrendered to the company, and there were substituted for them other policies payable to " Mary H. Hayes, if living. If not, then to her husband, Edmund Hayes, his executors, administrators or assigns." These policies gave Edmund Hayes no option to change the beneficiary; and no change in beneficiary was ever attempted.

Early in December, 1907, Edmund Hayes applied to the company for loans to himself on the several policies. A loan notice was thereupon sent to the insured, reading in part as follows:

" When a loan is made on a policy, an acknowledgment is sent by us that the policy will be returned on repayment of the loan; that in case of death of the assured before the maturity of the loan or if the policy is surrendered or cancelled on account of failure

to comply with the conditions of the loan, the cash balance, if any, after payment of the loan, will be paid to the parties legally entitled thereto."

The loans were made in December, 1907, and although in each instance the check of the company was made payable to " Edmund Hayes and Mary H. Hayes," the wife, by indorsement, turned over to her husband all the proceeds of the checks for his own use. The policies were all delivered to the company as collateral security for the loans, according to an " agreement and assignment," executed by both Edmund and Mary H. Hayes in the following form:

" The party of the first part agrees to loan and does hereby loan to the parties of the second part, the sum of ........... dollars, the receipt of which by the parties of the second part is hereby acknowledged; and the said parties of the second part agree to repay the same to the said party of the first part, at its office, 120 Broadway, New York City, on the ........ day of December, 1908.

" In Consideration of said loan the parties of the second part hereby assign, transfer and set over all their right, title and interest, including the right to exercise any and all options and privileges, in policy No ........... on the life of Edmund Hayes issued by said party of the first part, together with all money which may be payable under the same, to said party of the first part as collateral security for the repayment of said loan.

" In the Event of Default in the repayment of said loan upon the date hereinabove mentioned, the party of the first part is hereby fully authorized and empowered, without notice to and without demand for payment by the parties of the second part, to cancel said policy and to apply the cash surrender value of such cancellation to the payment of said loan and any unpaid interest; and upon the maturity of said policy, either by death or lapse of time, the party of the first part is hereby authorized and empowered to exercise any right or option and accept and extend any privilege or other benefit held, possessed or enjoyed by the parties of the second part, or any of them, under the terms and conditions of said policy, including the right to commute any amount due in installments, whether provided for in the policy contract or not. Should the surrender value of said policy exceed the amount of above loan with interest at five per cent thereon, then, and in that case, the excess value above the loan and interest shall be due and payable to the legal owner or owners of the policy on demand."

Next came a receipt from the company, as follows:

" We acknowledge that Policy No ........ on the life of Edmund Hayes has been placed with the Society as security for a loan of

$............ subject to the conditions of the Society's Loan Agreement, duly executed by the applicants for such loan. This loan will become due and upon repayment of same said policy will be returned.

" In the event of the death of the insured before the maturity of the loan, any indebtedness to the Society by reason hereof will be deducted from the amount payable under the policy, the balance being payable to the person or persons legally entitled thereto. in accordance with the terms of the policy.

" In the event of the cancellation of the policy owing to default in the repayment of the loan when due, the excess value thereof above the amount of the loan and interest shall be paid on demand to the person or persons legally entitled thereto, should its surrender value exceed the amount of the loan with interest thereon to date of settlement at 5 per cent."

Edmund Hayes died October 19, 1923, leaving a will which had been executed in May, 1923. His wife died intestate November 16, 1924. The five policies aggregated $66,283.14 in value. Edmund Hayes extended the time of repayment of the loans from year to year until his death, paying interest on the loans and premiums on the policies annually. When the Equitable Company paid the proceeds of the policies to the committee of Mary H. Hayes, on January 5, 1924, $33,824.39 was deducted to cover the loans which had been made by the company. The surrogate of Erie county has refused to allow the claim of the administrator of the wife's estate for this amount against the estate of Edmund Hayes. Hence this appeal.

The insurance company is not interested in the controversy. Its loan has been repaid. The question here is whether the estate of Edmund Hayes, who applied for the loans and received their proceeds, should indemnify the wife's estate, or whether the obligation to pay should rest upon the estate of the beneficiary of the policies.

The questions, discussed at length in the briefs, whether or not these policies of February, 1895, were " wife's policies " (Dom. Rel. Law, § 52), and whether — up to the time of the assignment of December, 1907 — the wife's interest was vested or contingent, are immaterial. After the policies were changed in form (as to beneficiary) in February, 1895, the wife became a beneficiary — a possible owner of proceeds of the policies — instead of a full owner as assignee. If these were then " wife's policies " the wife had the legal right to assign them, since she had no descendants and her husband joined in the assignment. (Dom. Rel. Law, § 52; *Sherman* v. *Allison*, 77 App. Div. 49; affd., 177 N. Y. 574.) If, on the contrary, they were not " wife's policies," the wife still had the right to assign her interest, whether it was vested or con-

tingent, "like any other property that she may own." (*Dannhauser* v. *Wallenstein*, 169 N. Y. 199, 211.)

These loans were not covered by section 7, chapter 301 of the Laws of 1909 (Ins. Law, § 101, subd. 7), *i. e.*, the loans were not compulsory "on the sole security" of the policy. But the loans were authorized by statute. (Laws of 1892, chap. 690, § 16.) Under the "agreement and assignment" the three contracting parties did not in terms contract that the company must collect back the loans (if collection should be necessary) out of the policies. They did not specifically agree that the amount of the loan "would be deducted" from the policies, as in *Faris* v. *Faris* (76 Ind. App. 336). The document simply "authorized and empowered" the company to cancel the policy, apply the cash surrender value on the loans, etc., in case the money lent should not be paid back when due. It is this which distinguishes this case from *Wagner* v. *Thieriot* (203 App. Div. 757, 760; affd., 236 N. Y. 588), relied on by the learned surrogate. The policy in that case was controlled by Laws of 1911, chapter 369, section 7 (Ins. Law, § 101, subd. 7), it having been taken out in 1916. It necessarily provided that the loan was an "advance" of a part of the moneys to become payable sometime later under the policy, and upon the "sole security thereof." If the policies involved in the instant case had contained similar provisions, the execution of the document of assignment by the beneficiary would necessarily have been a recognition and a ratification of those provisions. But as these policies read, deduction of unpaid loans from moneys to become due to the beneficiary after the death of the insured was merely optional with the company. Enforcement by the company of the personal liability of the insured to repay his loan was not prohibited. And the execution of the assignment by the beneficiary meant nothing more than that she signed it at the request of the company as assurance that as between her and the company, the latter might deduct from the proceeds of the policies its moneys due, in case the insured did not himself pay.

From the "agreement and assignment," and from all the transactions involved, we find that the wife was a surety, not a principal, as to these loans; and that, therefore, when she executed the agreement, she did not assent "to the substitution of the company as beneficiary of the policies in her place and stead, to the extent of its interest therein," as the learned surrogate has found, except as above stated. The fact that the checks were made out to both the husband and wife is not of controlling importance. The husband had applied for the loans for himself. The wife's indorsement of the checks was evidently a mere matter of course, on account of

the form in which the insurance company had drawn them as to name of payee. There is nothing to indicate that the wife ever made a claim or had an idea that any of the money was hers. The agreement and assignment of December, 1907, contained a covenant to repay the loans on a date certain. Since the company did not agree to resort to the policies alone for repayment, and Edmund Hayes applied for the loans, received all the proceeds, agreed to repay the loans on a specified date, and paid all interest and premiums during his lifetime — a personal liability of Edmund Hayes, a debtor relation to the insurance company, was created. And he (now his estate) should pay.

All these recited facts show that — even though the wife may have been a principal debtor as between her and the insurance company — still, as between her and her husband, she was but a surety; and that her estate should not lose this sum of money, representing loans made to Edmund Hayes, unless his estate cannot pay. The wife is in the same position as the wife who executes a bond and a mortgage on her property to secure her husband's debt (*Dibble* v. *Richardson*, 171 N. Y. 131); or who has joined in an assignment of an insurance policy as collateral security for a loan to her husband, and has also signed the promissory notes her husband gave for the loan. (*Union Central Life Ins. Co.* v. *Woods*, 11 Ind. App. 335.) The legal relation between cosigners of such instruments may always be shown by parol or documentary evidence. (*Hubbard* v. *Gurney*, 64 N. Y. 457.)

It cannot be held that the wife made a gift to her husband by indorsing the checks made out to her and her husband — in order that the husband might obtain the money which he had applied for. For as we view the case the wife had nothing to give. Her indorsement was quite *pro forma*. Ownership of the thing " given " must be in the donor. (*Matter of Van Alstyne*, 207 N. Y. 298.) The wife never owned any part of the money loaned.

The wife having been a surety, no Statute of Limitations has run against her claim. (*Blanchard* v. *Blanchard*, 201 N. Y. 134.)

The portion of the decree appealed from which disallows appellant's claim should be reversed on the law and facts, with costs, and the decree modified to provide for allowance of the claim as filed.

All concur, except CROUCH, J., who dissents and votes for affirmance in a memorandum. Present — CLARK, SEARS, CROUCH, TAYLOR and SAWYER, JJ.

CROUCH, J. (dissenting). The decisive question is whether or not the relation of debtor and creditor existed between the insured and the insurer at the time of the death of the insured. The policies themselves contain no provision relating to loans or giving

the right to the insured to secure a loan thereon from the insurer. But the insurer at the time the loan was made had the right under the law to make it. And under the statute which gave it that right, it was to loan " on the pledge to it of such policies and its accumulations as collateral security." The extent of the loan was confined to the " lawful reserve " on the policy. There is nothing said here about personal liability. The language is not so clear as in the later statute, which uses the phrase " on the sole security thereof." I think, however, that the effect was the same. Since the loan was confined to the lawful reserve, there could never be any question of personal liability. The loan in substance and effect was merely an advance. No situation could arise which would demand resort to personal liability.

On the background of that legislation the court must construe the contract existing between the parties after the loan agreement was made. Reading together the statute, the loan offer, the loan agreement and assignment, and the acknowledgment, the contract is instinct with an understanding and agreement that the sole effect of the transaction was an advance on the policy, reducing the amount payable thereon upon maturity to the surplus above the amount of the loan and interest. The whole insurance contract was reduced to that, subject to the right of the insured and beneficiary to repay the loan and thus restore the insurance contract to its original form.

The loan offer informed the insured that where a loan was made, then in case of death before the maturity of the loan, " the cash balance, if any, after payment of the loan, *will be* [not *may be*] paid to the parties legally entitled thereto." The language of the loan agreement was to the same effect. Upon maturity of the policy by death " the excess value above the loan and interest shall be due and payable to the legal owner or owners of the policy on demand." So, also, the loan acknowledgment accompanying the check for the amount of the loan, which says: " In the event of the death of the insured before the maturity of the loan, any indebtedness to the Society by reason hereof *will be* [not *may be*] deducted from the amount payable under the policy, the balance being payable to the person or persons legally entitled thereto."

My view is that notwithstanding the variations in the facts between this case and the *Wagner* case, the essence and effect of the contracts in both cases are the same. I, therefore, vote for affirmance.

Decree so far as appealed from reversed on the law and facts, and matter remitted to the Surrogate's Court with directions to enter a modified decree in accordance with the opinion, with costs.